**Mary Zelma ASSEO, Regional Director for Region 24 of the National Labor Relations Board, For and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**MOLEX CARIBE, INC., Respondent.**

**Civ. No. 87–1149 (JP).**

United States District Court,
D. Puerto Rico.

May 17, 1988.

Raymond E. Morales, Antonio F. Santos, Mary Zelma Asseo, Hato Rey, P.R., for petitioner.

Victor M. Comolli, McConnell, Valdés, Kelley & Sifre, San Juan, P.R., for respondent.

## OPINION AND ORDER

PIERAS, District Judge.

Petitioner Asseo, a Regional Director of the National Labor Relations Board (NLRB), has petitioned the Court for an injunction reinstating certain employees of respondent Molex Caribe and ordering respondent to cease and desist from certain specified activities which may constitute unfair labor practices under section 8(a) of the Labor Management Relations (Taft–Hartley) Act of 1947. 29 U.S.C. § 158(a). The jurisdiction of this Court to entertain this petition is found in section 10(j) of the Taft–Hartley Act, 29 U.S.C. § 160(j). The Court is empowered by that section to grant interim relief to petitioner during the pendency of the unfair labor practice proceedings before the NLRB.

■ The Court need not decide the merits of the underlying unfair labor practice, for that determination has been committed by Congress to the expertise of the Board. *Asseo v. Pan American Grain Co.*, 805 F.2d 23, 25 (1st Cir.1986). The district court's role is to determine whether there is reasonable cause to believe that the unfair labor practices charged by the Board occurred, i.e., whether the Board's position is fairly supported by the evidence. *Maram v. Universidad Interamericana de Puerto Rico*, 722 F.2d 953, 959 (1st Cir. 1983). If that determination runs in favor of the petitioner, the Court must then proceed to examine whether the issuance of temporary relief is "just and proper". *Gottfried v. Frankel*, 818 F.2d 485, 493 (6th Cir.1987). The issuance of a 10(j) injunction should preserve the status quo to give the Board time to make the necessary unfair labor practice determination, but "the relief to be granted is only that reasonably necessary to preserve the ultimate remedial power of the Board and is not a substitute for the exercise of that power." *Kobell v. Suburban Lines, Inc.*, 731 F.2d 1076, 1091 (3d Cir.1984).

## I. *Background*

The Regional Director for Region 24, petitioner Asseo, issued a complaint pursuant to a charge filed by one Ivys Maldonado, an employee of respondent Molex Caribe. The complaint charged that during the month of May 1987 members of the management of Molex Caribe questioned employees concerning the possibility of union organizing at the Molex Caribe plant, threatened discharge on plant closure on account of employees' organizational efforts, and created the impression that employees were under surveillance by management for possible organizational activities. These activities, if true, would constitute unfair labor practices under section 8(a) of the Taft–Hartley Act, restraining or coercing employees

from exercising their organizational rights under section 7 of the Taft–Hartley Act. Further, on May 14, 1987, respondent discharged complainant Maldonado and one Edda Quintana, and on May 19, discharged one Ana Hernández. The complaint charges that these three employees were discharged because of their activities on behalf of organizational efforts at respondent's plant. This activity would constitute an unfair labor practice under section 8(a)(3) of the Taft–Hartley Act, discriminating against employees because of their exercise of section 7 rights under the Taft–Hartley Act.

The parties have submitted the administrative record in this case, including the complete transcript of the nine-day hearing before an Administrative Law Judge for the Board. Testimony and documentary evidence presented at that hearing revealed the following:[1]

1. Respondent Molex Caribe is a Puerto Rico corporation, a subsidiary of Molex, Inc. Molex Caribe is engaged in a business the normal conduct of which affects interstate commerce to an extent sufficient to bring the corporation under the NLRB's jurisdiction under the Taft–Hartley Act. 29 U.S.C. §§ 152(2), (6), and (7).

2. Union General de Trabajadores Agrícola e Industriales is an organization which exists for the purpose of dealing with employers over wages, hours, and terms and conditions of employment through the administration of collective bargaining agreements within the meaning of the Taft–Hartley Act. 29 U.S.C. § 152(5).

3. In April 1987 Quintana met with a representative of the union to discuss the possibility of organization at Quintana's place of employ, the Molex Caribe plant.

4. Quintana spoke to other employees after meeting with the union representative. Those conversations concerned an informal canvassing of the workforce to ascertain worker interest in organizing under union auspices. One of the workers Quintana spoke with was Hernández.

5. Hernández, through a subterfuge, obtained a list of addresses of certain employees from Maldonado, using Maldonado's access to personnel files. Persons for whom Hernández obtained addresses apparently had expressed an interest in organizing. The list contained over forty names. Respondent, at that time, employed nearly seventy workers who would be susceptible to organizational efforts. Quintana's locker at the plant was where the list was ensconsed.

6. The list disappeared from Quintana's locker in late April. Maldonado, who as part of her duties kept duplicate keys to the lockers, subsequently discovered that Quintana's duplicate key, among others, was missing.

7. On or about May 1, a supervisor for Molex Caribe, Humberto Wys, called a meeting of workers to exhort them to improve their efficiency. Wys related, as one problem hindering efficiency, his observation that female employees were taking too many bathroom breaks. Wys further described a company where such absences from duty station were recorded by the workers signing a sheet. Hernández openly expressed disapproval of the prospect of such a system being instituted at Molex Caribe.

8. Later that day, Wys spoke to Hernández. Hernández testified before the administrative hearing that Wys said the following: "Your attitude, I do not like it at all. You are mobilizing the employees and if you continue with that attitude you either resign or I'll fire you." Hernández further testified that Wys went on to state "that he had the power to fire anybody that wanted to form a group or wanted to belong to a group."

9. Quintana met again with the union representative in early May and attempted to reconstruct the disappeared list. Quintana also supplemented the list with the names of other workers who may have felt favorably disposed towards a union.

<hr/>

1. Again, the Court does not here decide the credibility of any evidence presented but merely reviews the evidence to examine whether the petitioner has reasonable cause to believe that unfair labor practices have been committed.

10. In early May a supervisor asked Hernández if she had any knowledge of possible union organizing at Molex Caribe. The supervisor told Hernández that the General Manager of the facility, Luis Dávila, had asked the supervisor to investigate whether workers were considering organizing.

11. On May 12 Quintana was directed to Dávila's office. Quintana testified that Dávila stated that he had "been informed that you [Quintana] are organizing a union." Dávila, according to Quintana's testimony, asked if Quintana was in fact carrying out organizational activities. Dávila is alleged to have stated that if organizational activities were taking place, that certain employees would leave the factory. Finally, Dávila instructed Quintana to not speak to anyone concerning this conversation. Quintana nevertheless told Hernández about the conversation and that Hernández' name had been mentioned during its course.

12. On that same date, Hernández had a conversation with a supervisor. That supervisor allegedly related that Dávila knew of a list of employees sympathetic to organization, that Hernández' name was on the list, and that she was considered a leader of the group. The supervisor further commented that Dávila would fire Hernández because of involvement in organizational efforts.

13. On May 13, Hernández sought out Dávila to make a complaint concerning an unrelated matter. Dávila at that time asked Hernández whether there was an organizational campaign going on. Hernández denied it and Dávila stated that if such a campaign were underway that he would discharge two or three workers.

14. On May 14, Quintana was summoned to Dávila's office. Quintana testified that Dávila made the following statement: "Edda, the gossip about the union continues so I am going to have to suspend you." What was, in this statement, characterized as a suspension was an immediate discharge. Dávila accompanied Quintana as she went about the plant, gathering personal belongings from her locker and satisfying obligations with co-workers.

15. On that same date, Maldonado was summoned to Dávila's office, where Dávila asked for Maldonado's resignation. The next day Dávila offered severance pay, payment of accrued vacation, a good recommendation, and a prepared resignation letter. Maldonado resigned.

16. Maldonado subsequently had conversations with Quintana and Hernández. During the course of those conversations, Quintana and Hernández related Dávila's questions concerning organizational efforts. Maldonado related her knowledge of Dávila's "instructions" from the parent corporation, Molex, Inc., to close the plant if faced with a union organizing campaign.

17. Maldonado subsequently went to Dávila's home with the avowed purpose of seeking the reasons for Dávila's resignation request. Maldonado was apparently dissatisfied with the answers she received. When she subsequently described this meeting to Quintana, Quintana informed Maldonado that the latter's name had been on the original, disappeared list of possible union sympathizers.

18. Maldonado prepared a leaflet explaining that she had been asked to resign. The leaflet was distributed by Maldonado and Quintana outside the plant gates.

19. Dávila called a meeting of employees and explained that Maldonado had been discharged for unauthorized checking transactions and other unspecified misconduct. Hernández, present at the meeting, disagreed with Dávila's explication, and said that he was lying to the workers present. At Dávila's direction Hernández was physically removed from the meeting by a supervisor.

20. Hernández was discharged by Dávila later that day. Hernández' testimony recounted that Dávila was extremely agitated and said "I had already had [sic] you in a list to fire you." Hernández' letter of discharge states that she was fired for being disrespectful to Dávila.

21. The union representative who had initially met with Quintana in April testi-

fied that after Maldonado, Quintana, and Hernández' discharges, all organization efforts at Molex Caribe stopped.

## II.

█ The Board's petition points directly to certain incidents as the basis of unfair labor practice charges: Whys' May 1 conversation with Hernández; Hernández' May 12 conversation with another supervisor; Dávila's May 12 conversation with Quintana; and Dávila's May 13 conversation with Hernández and Quintana, and Hernández' discharges.

### A. *Wys' May 1 Conversation with Hernández*

After the worker's meeting, Wys spoke to Hernández. Wys did threaten to fire Hernández for "mobilizing the employees" (Hernández' testimony). Wys stated that he could "fire anybody that wanted to form a group or wanted to belong to a group." It is a reasonable inference from the collocation of circumstances concerning a meeting at which terms and conditions of employment were discussed, a worker publicly disagreeing with a company position, and that worker later, privately being threatened with discharge for "mobilizing," that the supervisor intended to restrain or coerce Hernández from acting in concert with other workers, i.e., those at the meeting, for mutual aid and protection. The petitioner, in this incident, has demonstrated reasonable cause to believe that an unfair labor practice was committed when Wys threatened to fire Hernández unless she changed her attitude. 29 U.S.C. § 158(a)(1).

### B. *Hernández' May 12 Conversations with Another Supervisor*

Hernández was confronted on May 12 with questions from a supervisor who informed her that Dávila had a list of persons involved in organizational efforts, that Hernández' name figured prominently on that list, and Dávila was considering firing Hernández for involvement with organizational activities. The supervisor's questions concerning whether organizational efforts were in fact taking place could reasonably be viewed as coercive in the face of the supervisor's statements about the list and Dávila's intentions. Further, the petitioner has reasonable cause to believe that respondent created an impression of surveillance over worker's organizational efforts by mentioning the existence of a list of persons involved in organizing. Although petitioner has not forcefully argued the point, Dávila's possession of a list shortly after such a list disappeared from Quintana's locker could reinforce the reasonable cause petitioner has to believe that respondent created an impression of surveillance of organizational efforts. 29 U.S.C. § 158(a)(1).

### C. *Dávila's May 12 Conversation with Quintana*

The gist of Dávila's May 12 conversation with Quintana was two-fold: first, a question concerning whether Quintana was involved in organizational efforts; and second, a threat to fire any person so involved. Dávila further specifically inquired about Hernández' involvement with any organizational efforts. The petitioner has shown, in this incident, reasonable cause to believe that respondents, through Dávila, made a coercive threat, i.e., discharge, to Quintana because of Quintana's possible involvement in concerted activities for the mutual aid and benefit of workers at Molex Caribe, i.e., assessing union support.

Dávila's reference to another worker, Hernández, and her possible involvement in organizational efforts, coupled with the threat of discharge to any worker involved in organizing, gives petitioner reasonable cause to believe that respondent created an impression that Quintana's (and Hernández') organizational efforts were under surveillance. This surveillance, again in light of the threat to discharge any worker involved in organizational activities, gives petitioner reasonable cause to believe that respondent was attempting to coerce workers in the exercise of their organizational rights. 29 U.S.C. § 158(a)(1).

### D. *Dávila's May 13 Conversation with Hernández*

The import of Dávila's remarks to Hernández on May 13 is identical to the import of Dávila's May 12 remarks to Quintana: involvement with organizational efforts at Molex Caribe shall result in discharge. The testimony adduced at the administrative hearing fairly supports petitioner's reasonable cause to believe that respondent made a coercive threat to Hernández over her organizational rights. 29 U.S.C. § 158(a)(1).

### E. *Quintana and Hernández' Discharges*

Quintana's May 14 dismissal was, according to her testimony, directly linked to "gossip about the union." Quintana's discharge must be viewed in light of her previous questioning by Dávila. In that conversation, only two days before her discharge, Dávila threatened to discharge any worker found involved in organizational activities at Molex Caribe. These two conversations, taken together, fairly support the petitioner's reasonable cause to believe that Quintana was discriminated against in the tenure of employment in order to discourage her membership in a labor organization. 29 U.S.C. § 158(a)(3).

Hernández' discharge does not present such clear evidence of union animus as testimony concerning the anti-organization statements of Dávila in direct relation to Quintana's discharge. Nevertheless, petitioner has made a showing, fairly supported by the record, or reasonable cause to believe that the firing of Hernández was an unfair labor practice. Hernández had received the same coercive threat as Quintana. Hernández had also been previously informed that Dávila had her name on a list as a leader of workers involved in organizational activities. As previously noted, there is reasonable cause to believe that respondent created the impression of surveillance of organizational activities. The concatenation of these circumstances with Hernández' testimony that Dávila stated he already had Hernández on a list to fire fairly supports a finding of reasonable cause to believe that respondent discriminated against Hernández in regard to tenure of employment in order to discourage her membership in a labor organization. 29 U.S.C. § 158(a)(3).

In each incident relied on by petitioner in support of the complaint in this case, there is reasonable cause, fairly supported by the record, which may be the basis for an unfair labor practice charge.[2]

### III.

Having determined that there is reasonable cause to believe that unfair labor practices have occurred, this Court must consider "the whole panoply of discretionary issues with respect to granting preliminary relief," i.e., the § 10(j) injunction. *Maram*, 722 F.2d at 953. In this circuit the standards for granting preliminary injunctive relief are (1) that plaintiff will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which granting injunctive relief would inflict on the defendant; (3) that plaintiff has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction. *Planned Parenthood League of Mass. v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir.1981). The specific relief requested, requiring Molex Caribe to extend offers of reinstatement to Hernández and Quintana, to cease and desist from any and all unfair labor practices, and to post the opinion of the Court leading to the relief, would be proper to preserve status quo and prevent respondent from taking any action that would illegally forestall protected concerted activity. For that reason, petitioner, standing in as protector of the employees rights to engage in protected concerted activity with an eye to-

---

2. The Court does not examine Maldonado's discharge insofar as the Board does not rely on it for the purpose of this petition. Further, the Regional Director moved for, and was granted at the administrative hearing, leave to amend the complaint by dropping Maldonado's allegations. The testimony relating to Maldonado is nevertheless included because of the support it lends to the factual setting in which these unfair labor practice charges arose.

wards organization, will suffer irreparable harm absent a § 10(j) injunction. Before the Board is able to make the factual findings of whether or not respondent's activities constituted unfair labor practices, the respondent will have succeeded in shutting down whatever small organizational efforts were underway at Molex Caribe. Simply because there are no allegations of continuing unfair labor practices (save failure to reinstate Hernández and Quintana) does not mean that injunctive relief is inappropriate "since the prior activities could have lingering effects on union activity." *Gottfried*, 818 F.2d at 496.

This injury outweighs any harm respondent would suffer by extending offers of reinstatement or posting legal notices. The reinstatement of Quintana and Hernández may be a burden but this is outweighed by the interest of the Board in an orderly administrative adjudication of the unfair labor practice charges and protection of workers' rights to engage in protected concerted activity. The posting of this Court's opinion and order, and an order to respondent to cease and desist from activity that constitutes unfair labor practices are minimal burdens.

As to the third factor, likelihood of success on the merits, the Court will simply state that petitioner has made a reasonable showing of likelihood of success on the merits.

Finally, as to ensuring that the public interest is not harmed by a grant of injunctive relief, the Court finds that "the public has an interest in ensuring that the purposes of the [Taft–Hartley] Act be furthered." *Asseo*, 805 F.2d at 28.

### IV.

Having found that the Regional Director had reasonable cause to believe that respondent has committed unfair labor practices, and having further found the issuance of injunctive relief to be just and proper, the Court ORDERS as follows:

A. The Court hereby ENJOINS AND RESTRAINS respondent, Molex Caribe, its successors and assigns, officers, representatives, agents, servants, employees, attor-

neys and all persons acting in concert or participation with it or them, pending the final disposition of the mattes involved herein pending before the Board, from:

1) Coercively interrogating employees concerning their knowledge of, interest in and activities on behalf of Union General de Trabajadores Agrícolas e Industriales, or any other labor organization.

2) Creating the impression of surveillance of its employees' activities on behalf of Union General de Trabajadores Agrícolas e Industriales, or any other labor organization.

3) Threatening employees with discharge because of their activities on behalf of Union General de Trabajadores Agrícolas e Industriales, or any other labor organization.

4) Informing employees that they would never work again because of their activities on behalf of Union General de Trabajadores Agrícolas e Industriales, or any other labor organization.

5) Discharging or otherwise discriminating against employees because they engage in activities on behalf of or in support of Union General de Trabajadores Agrícolas e Industriales, or any other labor organization, or because employees engage in protected concerted activities.

6) In any other manner discriminating against employees in regard to their hire or tenure or terms or conditions of employment to discourage membership in Union General de Trabajadores Agrícolas e Industriales, or any other labor organization.

7) In any other manner interfering with, restraining, or coercing its employees in the exercise of their rights guaranteed under Section 7 of the Act, 29 U.S.C. Section 157.

B. The Court FURTHER ORDERS Respondent, its successors and assigns, officers and representatives, agents, servants, employees, attorneys, and all other persons acting in concert or participation with it, or them, pending the final disposition of the matters involved herein pending before the

Board, to take the following affirmative action:

1) Offer immediate reinstatement to employees Edda Quintana and Ana Rosa Hernández to their former positions or substantially equivalent positions of employment.

2) Post copies of the District Court's Opinion and Order, in the English and Spanish language, in Respondent's facility at locations where employee notices are normally posted.

3) Require Respondent to give its managers and supervisors copies of the District Court's Opinion and Order and a written directive to refrain from the conduct proscribed herein.

IT IS SO ORDERED.